## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) BARBARA BOYD BEATTY; | ) |
| (2) RICHARD S. BEATTY, as Trustee of | ) |
| the Barbara Boyd Beatty Trust; and | ) |
| (3) DOWNING INVESTMENTS, LLC, a | ) |
| Louisiana Limited Liability Company, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. CIV-12-1021-M |
| | ) |
| (1) JRMB II, Inc., an Oklahoma | ) |
| Corporation; | ) |
| (2) THE FORT SILL NATIONAL BANK, | ) |
| a National Banking Association; | ) |
| (3) THE CITY NATIONAL BANK AND | ) |
| TRUST COMPANY OF LAWTON, | ) |
| OKLAHOMA, a National Banking | ) |
| Association; | ) |
| (4) ZELDA M. DAVIS; | ) |
| (5) JOHN R. DAVIS; | ) |
| (6) ROMA LEE PORTER; | ) |
| (7) GEORGE L. PORTER; and | ) |
| (8) TRESEA M. MOSES; | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs, Barbara Boyd Beatty and Richard S. Beatty, as Trustee of the Barbara

Boyd Beatty Trust, and Downing Investments, LLC (collectively, "Plaintiffs"), for their

complaint against Defendants JRMB II, Inc., The Fort Sill National Bank ("FSNB"), The

City National Bank and Trust Company of Lawton ("CNB"), Zelda M. Davis, John R.

Davis, Roma Lee Porter, George L. Porter, and Tresea M. Moses (collectively,

"Defendants"), allege and state as follows:

## STATEMENT OF THE CASE

1.      Plaintiffs are former shareholders that were forcibly cashed out of their investments in JRM Bancorp, FSNB, and CNB through an unfair process and at grossly unfair and inadequate price.  The process by which Plaintiffs were forcibly cashed out violated numerous duties owed to Plaintiffs, including fiduciary duties and the duty of complete fairness.  In addition, due to numerous fraudulent statements and/or omissions, Defendants violated state and federal securities laws, entitling Plaintiffs to an award of monetary relief, as well as other necessary and appropriate relief, as stated herein.

## <u>PARTIES</u>

2.      Plaintiff Barbara Boyd Beatty is a resident of the District of Columbia.

3.      Plaintiff Richard S. Beatty is the trustee of the Plaintiff Barbara Boyd Beatty Trust, and resides in the District of Columbia.

4.      Plaintiff, Downing Investments, LLC ("Downing Investments") is a Louisiana limited liability company whose address is 94 Lee St., Franklin, Louisiana 70538.

5.      Defendant JRMB II, Inc., ("JRMB II") is an Oklahoma corporation whose principal place of business is 500 Montgomery Square, Lawton, Oklahoma.  JRMB II, Inc. is the successor by merger to J.R. Montgomery Bancorporation ("JRM Bancorp"). JRMB II is a holding company owning all the stock of Defendants Fort Sill National Bank and City National Bank and Trust Company of Lawton.

6.      Defendant Fort Sill National Bank ("FSNB") is a national banking association whose principal place of business is 1647 Randolph Road, Fort Sill, Oklahoma 73503.

7.      Defendant City National Bank and Trust Company of Lawton ("CNB") is a national banking association whose principal place of business is 500 Montgomery Square, Lawton, Oklahoma 73501.

8.      Defendant Zelda M. Davis is a resident of Jackson, Mississippi.

9.      Defendant John R. Davis is a resident of Lawton, Oklahoma.

10.     Defendant Roma Lee Porter is a resident of Lawton, Oklahoma.

11.     Defendant George L. Porter is a resident of Lawton, Oklahoma.

12.     Defendant Tresea M. Moses is a resident of Lawton, Oklahoma. Defendants Zelda M. Davis, John R. Davis, Roma Lee Porter, George Porter and Tresea M. Moses are collectively referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this matter pursuant to Section 27 of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C §78aa, and 28 U.S.C. §1331 as this is a civil action arising out of 10(b) of the Exchange Act, 15 U.S.C. §78j(b).

14.     This Court has jurisdiction of the state-law claims pursuant to 28 U.S.C. §1367(a) as the state-law claims are so related to federal security claims in this lawsuit that all claims form part of the same case or controversy.

15.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa because a substantial part of the events giving rise to this controversy occurred in this district, including the operation of the defendant banks and the auxiliary business described below.

## BACKGROUND FACTS

### A. The Plaintiffs' Interest in the Target Companies

16.     Plaintiffs assert incorporate paragraphs 1-15 by reference as though fully stated herein.

17.     Plaintiffs are a group of former minority shareholders who, as a result of the Squeeze-Out Mergers (as defined in paragraph 54, *infra*), were cashed out of their ownership of stock in JRM Bancorp, FSNB and CNB (collectively, the "Target Companies") effective December 28, 2010.   The Squeeze-Out Mergers constituted a forced sale of Plaintiffs' stock in the Target Companies.

18.     Up until the Squeeze-Out Mergers, Plaintiffs owned the number of shares of common stock of the Target Companies as set forth below:

|  | JRM Bancorp | FSNB | CNB |
|---|---|---|---|
| Barbara Boyd Beatty | -0- | 1,447 | -0- |
| Richard S. Beatty, Trustee | -0- | 303 | -0- |
| Downing Investments, LLC | 105 | -0- | 2,140 |

### B. The Individual Defendants' Status as "Control Group" of the Target Companies.

19.     Each of the Individual Defendants bears a familial relationship to the others.   Zelda M. Davis and Roma Lee Porter are sisters.   John R. Davis is the son of Zelda M. Davis.   George L. Porter and Tresea M. Moses are the son and daughter of

4

Roma Lee Porter.   Collectively, the Individual Defendants controlled the Target Companies as more specifically set forth below.  Because of this relationship and control, the Individual Defendants will be referred to as the "Control Group."

20.     At all times relevant hereto, the Control Group beneficially owned, directly and indirectly, 69.3% of JRM Bancorp.  The Control Group constituted a majority of the directors and all of the executive officers of JRM Bancorp.

21.     At all times relevant hereto, the Control Group beneficially owned, directly and indirectly, 51.3% of FSNB.   The Control Group constituted a majority of the directors and a majority of the executive officers of FSNB.

22.     At all times relevant hereto, the Control Group beneficially owned, directly and indirectly, 59% of CNB.  The Control Group constituted at least half of the directors and a majority of the executive officers of CNB.

23.     During times relevant hereto, both FSNB and CNB had an election in effect pursuant to Section 7.2000 of Title 12 of the Code of Federal Regulations to follow the corporate governance procedures of the laws of Oklahoma, the state in which both FSNB and CNB are located.

C. **The Control Group's Formation and Operation of Ancillary Businesses.**

Data Processing, Incorporated

24.     In addition to their status as the Control Group of the Target Companies, the Individual Defendants have also over the years formed and operated two ancillary businesses: Data Processing, Incorporated ("DPI") and Telephone Services, Inc. ("Telephone Services").   These businesses have allowed the Individual Defendants to

siphon substantial profits and assets away from the Target Companies and into their own control.

25.     DPI was incorporated in 1991 by Defendant John R. Davis, a member of the Control Group, for the stated purpose of providing data processing services to FSNB and CNB. At the time of its organization, only persons who were a lineal descendant of J.R. Montgomery were permitted to become shareholders of DPI. At all times relevant hereto, the Individual Defendants collectively owned or controlled 76.22% of DPI, with the balance owned by certain cousins of the Individual Defendants.  The Individual Defendants or some portion of the Individual Defendants, constituted all of the directors and executive officers of DPI.  At no time have any of the Plaintiffs owned or controlled, directly or indirectly, any shares in DPI.

26.     DPI does not maintain a separate office but instead occupies space in banking facilities owned by FSNB and CNB.

27.     As national banks, at all times relevant hereto, FSNB and CNB were each authorized under applicable law and regulation to provide data processing services for their internal operations or the operation of the affiliates, either directly or through a wholly-owned owned or jointly owned operating or bank service corporation subsidiary. As such, the data processing tasks performed by DPI are routinely performed by national banks themselves or by subsidiaries of national banks.

28.     As a registered bank holding company, at all times relevant hereto, JRM Bancorp was authorized under applicable law and regulation to provide data processing services for its own internal operations and for the operations of its subsidiary banks.  As

such, the data processing tasks performed by DPI are routinely performed by bank holding companies such as JRM Bancorp for their subsidiary banks such as FSNB and CNB.

29.     The amounts paid to DPI for data processing services for many years prior to 2010, far exceeded what is ordinary and customary in the banking industry for amounts charged by third-party, non-affiliated data processing service providers.

30.     At all times relevant hereto, DPI provided certain unspecified services to FSNB and CNB, or otherwise was granted a contractual right to revenues, which entitled DPI to receive Interchange Fee Income that would otherwise have been paid to FSNB and CNB for many years prior to 2010.

31.     DPI also provided certain internet banking services to FSNB and CNB for many years prior to 2010.  The amounts paid by FSNB and CNB to DPI for internet banking services far exceeded what is ordinary and customary in the banking industry for amounts charged by third-party, non-affiliated internet banking service providers.

32.     As a result of the extraordinary charges for data processing and internet banking services and the diversion of Interchange Fee Income from FSNB and CNB to DPI, DPI was able for many years to (1) pay extraordinary salaries and other employee benefits, which were paid in large part to the Control Group, (2) pay extraordinary directors' fees which, were paid entirely to the Control Group, (3) realize an extraordinary level of income based upon DPI's equity capital, and (4) pay extraordinarily large dividends to DPI shareholders (which were primarily the members

of the Control Group), to wit and solely for the year ended December 31, 2009, amounted to the following:

    a.    Salaries in the amount of $1,205,148.85;

    b.    Directors' fees in the amount of $113,000;

    c.    Net income in the amount of $2,974,160.18, which, based upon year end stockholders' equity of $5,248,907.24, amounted to a return on equity of 56.67%; and

    d.    Aggregate dividends in the amount of $2,150,000, of which $1,638,730 would have been paid to the Control Group based upon their DPI ownership percentage.

33.    The Office of the Comptroller of the Currency ("OCC") did not approved the service or fee agreements between the FSNB or CNB and DPI.

<u>Telephone Services, Inc.</u>

34.    Telephone Services was incorporated in 1996.  The business purpose of Telephone Services is unclear. At all times relevant hereto, the Control Group owned or controlled 100% of the outstanding common stock of Telephone Services. The Control Group, or some portion of the Control Group, constituted all of the directors and executive officers of Telephone Services.  At no time were any of the Plaintiffs permitted to own or control, directly or indirectly, any shares of Telephone Services.

35.    As national banks, at all times relevant hereto, FSNB and CNB were each authorized to provide any telecommunication services necessary for their internal operations.  As a registered bank holding company, at all times relevant hereto, JRM

Bancorp was authorized under applicable law and regulations to provide any telecommunication services necessary for the operations of its subsidiary banks.

36.     As reflected in FSNB and CNB's publicly available Consolidated Reports of Condition & Income and related schedules filed with federal bank regulatory authorities, for the years ending December 31, 2008 and 2009, FSNB and CNB each paid an extraordinary amount for telecommunication expenses, which amounts were far in excess of telecommunication expenses incurred by peer institutions, to wit:

| Year | FSNB | CNB | Total |
|------|------|-----|-------|
| 2008 | $1,324,000 | $485,000 | $1,809,000 |
| 2009 | $1,412,000 | $670,000 | $2,082,000 |

37.     FSNB and CNB each incurred similar excessive telecommunication expenses for many years prior to 2008.

38.     All or a portion of the telecommunication expenses incurred by FSNB and CNB were being paid by FSNB and CNB to either Telephone Services or DPI.

39.     The OCC did not approve the service or fee agreements between the FSNB or CNB and Telephone Services.

D.  **The Control Group's Orchestration of the Squeeze-Out Merger**

40.     At the time of the Squeeze-Out Mergers, there were 2,255.7498 shares of JRM Bancorp common stock held by 15 record holders, 20,565 shares of FSNB common stock held by 40 record holders and 80,000 shares of CNB common stock held by 35

record holders.  The equity interests of all but two of the record holders (JRM Bancorp and JRMB II) were eliminated in the Squeeze-Out Mergers.

41.     Sometime during the first quarter of 2010, the Control Group conspired to and did orchestrate a scheme to squeeze out minority shareholders of the Target Companies for the purpose of consolidating their ownership and control of Target Companies and perpetuating that control in themselves and their heirs by making all transfers of stock subject to a right of first refusal, the exercise of which would be controlled by those shareholders who controlled JRMB II (i.e., the Control Group.)

42.     On or about April 6, 2010, all or part of the Control Group met with Ron Pape, the attorney for the Target Companies, for the purpose of selecting those shareholders of the Target Companies that would be permitted to continue as owners of FSNB and CNB through JRMB II, the new holding company to be subsequently incorporated.  All other shareholders, initially estimated by the attorney as owning 203 shares (9.00%) of JRM Bancorp, 2,980 shares (14.49%) of FSNB, and 6,656 shares (8.32%) of CNB, were selected for elimination from the ownership of the Target Companies.

43.     The Control Group's selection of shareholders of the Target Companies who would be permitted to continue as owners of FSNB and CNB through JRMB II was not based on the number of shares owned, state of residence of the shareholder, or any business purpose.  Rather, the sole qualification for selection as a continuing owner was whether the shareholder (or an affiliate of the shareholder) was either (a) a lineal descendant of J.R. Montgomery or (b) a director (or affiliate of a director) of FSNB or

10

CNB.  Virtually all non-familial minority shareholders were to be involuntarily cashed out.  The desire on the part of the Control Group to cause FSNB and CNB to be taxed under Subchapter S of the Internal Revenue Code was but a pretext for the real objective of eliminating non-familial minority shareholders from any ownership, direct or indirect, in FSNB and CNB.

44.   In making the selection of which shareholders would be allowed to continue and which shareholders would be eliminated through squeeze-out mergers, the Control Group acted without obtaining any Board of Directors approval or observing any other corporate formalities on the part of the Target Companies.  Further, JRMB II was not even organized until September 27, 2010, yet the Control Group engaged on April 6, 2010, in making the determination for it which shareholders would be permitted to continue as owners of FSNB and CNB through JRMB II.

45.   As a result of the scheme, the Control Group was able to (a) increase its direct and indirect ownership of JRMB II (the successor by merger to JRM Bancorp), FSNB and CNB to approximately 75% of the outstanding stock, and (b) insure that they, acting through JRMB II, would have the right of first refusal of all stock in JRMB II that they did not already own or control.

46.   As a result of the Restructuring Plan (as defined *infra*), the Control Group was able to dramatically increase the value of its interests in the combined companies from approximately $104.7 million to $160.2 million.  The net benefit to the Control Group from the Restructuring Plan, after the capital contribution of approximately $6

million made to JRMB II for the purpose of facilitating the squeeze out, is estimated at $49.5 million.

47.     The Control Group, together with JRM Bancorp, FSNB and CNB, owed the fiduciary duties of care and loyalty to all shareholders and not just those shareholders who were descendants of J.R. Montgomery and certain affiliated parties.  By selecting virtually all non-familial minority shareholders for elimination as owners of the Target Companies, the Control Group and the Target Companies breached their fiduciary duties of care and loyalty to each of those minority shareholders.

48.     In addition, by making fraudulent omissions regarding the Control Group's involvement with ancillary businesses allowing the Control Group to make wrongful diversion of profits and assets away from Target Companies, the Control Group caused additional damages to Plaintiffs in connection with the forced sale of their securities and/or prevented Plaintiffs from taking additional steps that they would have otherwise taken.

## THE RESTRUCTURING PLAN

49.     The Control Group caused the Target Companies to hire the Bank Advisory Group, L.L.C. ("BAG"), a purportedly independent financial advisor, to evaluate and establish (i) the appropriate exchange ratios to be used in an exchange offer to be conducted by JRMB II and (ii) the appropriate consideration to be paid to the squeezed-out minority shareholders.  Purportedly based on that advice, JRMB II made a tender offer to selected shareholders of the Target Companies to exchange shares of JRMB II for shares of the Target Companies and the Target Companies entered into Merger

Agreements to cash out the minority shareholders (including Plaintiffs) at a price of $27,750 per share of JRM Bancorp common stock, $3,775 per share of FSNB common stock, and $660 per share of CNB common stock.

50.    The scheme referred to in paragraphs 40 through 48, *supra*, was initiated through a restructuring plan (the "Restructuring Plan") having the purported purpose of enabling FSNB and CNB to be taxed as Subchapter S corporations but which was actually a pretext for the real objective of eliminating as shareholders virtually all persons or entities who were not lineal descendants or affiliates (including trusts) of lineal descendants of J.R. Montgomery.   The Restructuring Plan consisted of at least the following elements:

a.    Establishment of a new company, JRMB II, that would conduct an exchange offer (the "Exchange Offer") made to selected persons (principally lineal descendants of J.R. Montgomery or their affiliates) to exchange shares of common stock of JRM Bancorp, FSNB and CNB for shares of common stock of JRMB II. Under the terms of the Exchange Offer, in order to participate and receive shares of common stock of JRMB II, each person to whom the Exchange Offer was made was required to enter into a shareholder agreement with JRMB II which, among other matters, granted to JRMB II a "first and prior right" to purchase any shares of JRMB II which the shareholder desired to sell at any time in the future;

b.    The establishment of FSNB II, N.A. and CNBT II, N.A. with which FSNB and CNB would merge under terms that prescribed that all shares of FSNB and CNB which were not owned by JRM Bancorp or JRMB II would be converted

into the right to receive a cash payment with the former holders of such shares being thereby squeezed out as shareholders of FSNB and CNB; and

c.     The merger of JRM Bancorp with and into JRMB II under terms that prescribed that all shares of JRM Bancorp which were not owned by JRMB II would be converted into the right to receive cash payment with the former holders of such shares being thereby squeezed out as shareholders of JRM Bancorp.

51.     At the time of the approval of the merger of JRM Bancorp with JRMB II (the "JRM Bancorp Merger") the Control Group constituted a majority of the directors (five of eight) of JRM Bancorp and a majority of the directors (five of six) of JRMB II. At the time of the approval of the JRM Bancorp Merger by JRMB II, JRMB II owned 86.33% of the common stock of JRM Bancorp and the Control Group owned or controlled, directly or indirectly, approximately 75% of JRMB II.

52.     At the time of the approval of the merger of FSNB with FSNB II, N.A. (the "FSNB Merger"), the Control Group constituted a majority of the directors (five of eight) of FSNB and a majority of the directors (five of six) of FSNB II, N.A. At the time of the approval of the FSNB Merger by the shareholders of FSNB and FSNB II, N.A., the Control Group owned or controlled, directly or indirectly, 100% of the outstanding stock of FSNB II, N.A. and 75.13% of the outstanding common stock of FSNB.

53.     At the time of the approval of the merger of CNB with CNBT II, N.A. (the "CNB Merger"), the Control Group constituted half of the directors (five of ten) of CNB and a majority of the directors (five of seven) of CNBT II, N.A. At the time of the approval of the CNB Merger by the shareholders of CNB and CNBT II, N.A., the Control

Group owned or controlled, directly or indirectly, 100% of the outstanding stock of CNBT II, N.A. and 91.1% of the outstanding common stock of CNB.

54.     At no time during the implementation of or execution of the Restructuring Plan did the Control Group (a) abstain from voting as directors on the JRM Bancorp Merger, the FSNB Merger or the CNB Merger (collectively, the "Squeeze-Out Mergers") because of their personal interest in, and benefit each would receive as a result of, the transactions, (b) abstain from voting (or causing JRM Bancorp and JRMB II, which they controlled, to abstain from voting) as shareholders on the Squeeze-Out Mergers because of their personal interest in, and benefit each would receive as a result of, the transactions, or (c) establish an independent committee of disinterested directors of each of JRM Bancorp, FSNB and CNB to (i) identify and retain a qualified independent appraisal firm to provide a fair value appraisal of the shares of JRM Bancorp, FSNB and CNB, (ii) consider and approve the fairness of who received the Exchange Offer or the cash consideration to be paid to shareholders being squeezed out in the Squeeze-Out Mergers, or (iii) consider and make recommendations to the full Boards of Directors of JRM Bancorp, FSNB and CNB as to the selection of those who would receive the Exchange Offer and/or the propriety of the Squeeze-Out Mergers.

55.     As stated in Paragraph 50 above, the Exchange Offer was made to selected persons that consisted principally of members of the Control Group and their immediate families.  Plaintiffs were not among those selected to receive an Exchange Offer.

56.     Each of the Squeeze-Out Mergers was closed on December 28, 2010.  The Control Group, by virtue of its members' stock ownership and control of each of the

Target Companies and each Board of Directors of the Target Companies, controlled and directed the affairs of each of the Target Companies. Their actions caused JRMB II and the Target Companies to structure, approve and implement the Squeeze-Out Mergers which in turn caused JRMB II and the Target Companies to be in breach of their fiduciary duties owed to the Plaintiffs and the other minority shareholders.

57.    Information Statements were issued to all minority shareholders by the Defendants in connection with The Squeeze-Out Mergers. The Information Statements included fairness opinions provided by BAG for each of the Squeeze-Out Mergers, and described BAG as an "independent appraiser" and an "independent financial analyst and advisor." Despite these assertions of independence, BAG was not independent and, in fact, members of the Control Group interjected themselves in the appraisal process to such an extent that the appraisals performed by BAG on the Target Companies were tantamount to Made As Instructed.

58.    BAG treated the Control Group as a client and BAG's principal desire was to provide appraisals that were far less than the fair value of the Target Companies.

59.    As one of its initial steps to prepare its appraisals, BAG provided to management of each of the companies a "Valuation Questionnaire" in which it requested management to project the asset growth rate, return on average assets and dividends paid as a percent of income for the period 2011 through 2016 with an express statement that the information will be used "to forecast future earnings, dividends, and capital levels."

60.    BAG's second invitation to the Control Group to join in the appraisal process came with its distribution of financial projections for FSNB on July 15, 2010 and

CNB on July 16, 2010.   Accompanying both projections were emails from Clayton Young, the BAG employee responsible for the preparation of the financial projections for each of the companies.  In an e-mail on July 15, 2010 to John Davis, President of FSNB, Mr. Young stated that BAG "valued [his] viewpoint as the person 'on the ground' and would appreciate [his] input" on the projections.  An identical e-mail message was sent by Mr. Young to Jim Cantrell, President of CNB, on July 16, 2010.  This invitation for input commenced an ongoing dialogue, by email and telephone, between Clayton Young and various members of the Control Group and other officers of FSNB and CNB that had as its objective to lower BAG's financial projections for each of FSNB and CNB, and thereby lower the financial projections for JRM Bancorp.  Ultimately, Clayton Young and the other members of BAG's team followed their client's requests and the final financial projections that were used by BAG for the valuations contained projected earnings that were significantly undervalued.

61.     In an effort to further drive down the appraisal results to a level satisfactory to its client, BAG changed its analysis of the risk profile of each of FSNB and CNB in order to increase the discount rate applied to each of these companies' financial projections.   Specifically, BAG increased its "specific company risk adjustment" assigned to FSNB from 2% to 5.5% and to CNB from 1% to 4%.  In this case, BAG's increase in its "specific company adjustment rates" for FSNB and CNB resulted in a corresponding increase in the discount rate applied by BAG, and had a dramatic and downward result – by approximately 20% – BAG's appraisals of the Target Companies.

62.     BAG's actions throughout this entire process from May to early September 2010, reflect a desire to satisfy its client, and belies any claim or assertion that BAG was independent.   Clayton Young and the other members of BAG's team were clearly listening to their client.

## DEFENDANTS' UNTRUE OR MISLEADING STATEMENTS/OMISSIONS

63.     In connection with the Squeeze-Out Mergers, Defendants made numerous untrue or misleading statements and omissions to Plaintiffs.

### The Deceptive and Misleading Information Statements

64.     Defendants mailed three Information Statements to minority shareholders, including Plaintiffs, for use in the three Squeeze-Out Mergers.  Each contained similar untrue or misleading statements of material fact and omissions of material facts necessary in order to make the statements made in the Information Statements not misleading.  The Information Statements were never approved by the OCC, the Federal Reserve Bank of Kansas City, or any other state or federal agency.

65.     The untrue or misleading statements of material fact and omissions of material facts necessary in order to make the statements made in the Information Statements not misleading include, but are not limited, to the following:

a.     The Information Statements stated that the "primary objective" of the Restructuring Plan was to enable JRMB II, JRM Bancorp, FSNB and CNB to be treated as Subchapter S corporation (or qualified Subchapter S subsidiaries, as applicable) under the Internal Revenue Code.  The Information Statements did not disclose that the principal purpose of the Restructuring Plan was to eliminate

18

virtually all non-familial minority shareholders and thereby increase the ownership of the Control Group in the combined entities.

      b.      While the Information Statements provide that each Squeeze-Out Merger will be financed, in part, "by cash dividends declared and paid by Fort Sill National Bank and/or City National Bank to JRMB II immediately following consummation of the Merger," nowhere in the Information Statements did it specify the amount of these dividends.  Only in footnotes to the pro forma financial statements attached to each of the Information Statements is one able to discern that a total of $38.22 million would be paid to cash out the minority shareholders and, of that, a total of $28.756 million was coming from cash dividends paid by FSNB and CNB.  Shareholders owning a total of 24.87% of the outstanding stock of FSNB were squeezed out in the FSNB Merger; shareholders owning a total of 13.67% of the outstanding stock of JRM Bancorp were squeezed out in the JRM Bancorp Merger; and shareholders owning a total of 8.9% of the outstanding shares of CNB were squeezed out in the CNB Merger.  Based on their ownership of each of these entities, the squeezed out shareholders' interest in these dividends amounted to $8.1 million, consisting of $5.661 million in the case of FSNB, $1.905 million in the case of JRM Bancorp, and $.534 million in the case of CNB.  The Information Statement failed to disclose that the minority shareholders' own interest in the capital of FSNB and CNB was being used to squeeze them out.

c.      Not only did the Information Statements fail to properly disclose the amount of the contemplated dividends (and the squeezed out shareholders' interest therein), but they also failed to disclose that the appraisals obtained from BAG that were used to establish the cash out price had discounted the value of the capital from which these dividends were paid as part of establishing the "value" of the stock.  The discount rate employed by BAG was (i) in the case of FSNB, 15.27% over a five-year period, (ii) in the case of JRM Bancorp, 13.77% over a period of what appears to be an indefinite period, and (iii) in the case of CNB, 13.77% over a five-year period.  As such, not only were the squeezed out shareholders having what amounted to their own money used for the squeeze-out, but when it came to determining the fair value of their shares, the money being used to pay them was discounted at either 15.27% or 13.77% per year.  These rates are excessive and the fact that discounts of any amount were being applied when the funds were being used immediately to fund the squeeze-out is indefensible and abusive.  Nowhere was this disclosed in the Information Statements.

d.      Each of the Information Statements described BAG as "an independent appraiser experienced in the financial analysis and valuation of financial institutions."  But BAG was clearly not independent and was in fact an agent of the Control Group hired to establish and authenticate an unfair price to be paid to the squeezed-out shareholders.   Further, none of the Information Statements disclosed that, in a published opinion of the Appellate Division of the Superior Court of New Jersey (344 N.J. Super. 83, 780 A.2d 553) related to a

corporate reorganization that included a Subchapter S election similar to the Restructuring Plan, BAG was described as being "known as a Subchapter S Squeeze-out machine."

e.      While each of the Information Statements refers to a "fair value analysis" prepared by BAG on the price to be paid for the shares of the Target Companies, and references a letter issued by BAG (the "BAG Letter") attached to each Information Statement as an appendix as the "fair valuation analysis," (i) nowhere in any Information Statement nor in any appendices thereto is there a description of the procedures followed, the findings of, or the bases for and methodology used in arriving at such findings contained in the financial analysis performed by BAG, and (ii) the BAG Letter attached to each Information Statement is only a fairness opinion from a "financial standpoint" and is not a "fair valuation analysis" despite being described as such.  Clearly, such a "fairness opinion from a financial standpoint" does not satisfy the requirement of Oklahoma law which is to wit: "fair value" or what would be received if all of the shares of the Target Companies were sold and the total proceeds divided on a per share basis.

f.      Nowhere in the Information Statements was there any information with respect to (i) dividend history of the Target Companies, (ii) the current and historical book value of the Target Companies, or (iii) current and historical financial data of the Target Companies, including net interest income, other operating income, provisions for loan and lease losses, income (loss) from

continuing operations, income (loss) from continuing operations per common share, total assets.  Because this pertinent and material financial data was omitted, minority shareholders were not provided necessary information in order to make an informed decision as to the fairness of the cash out merger price being offered in each of the Squeeze-Out Mergers.

g.     Nowhere in the Information Statements was there any disclosure as to the factors used by JRMB II (or the Control Group) in its determination of which shareholders would be extended the opportunity to participate in the Exchange Offer and why those shareholders who would otherwise qualify as Subchapter S shareholders were not extended the opportunity to participate in the Exchange Offer.

h.     Nowhere in the Information Statements were there any disclosures as to the dramatic increase in the value of the ownership interest in the combined companies that the Control Group would realize by reason of the Squeeze-Out Mergers and the Restructuring Plan.

66.    Had the items in Paragraph 65(a) through (h) been properly disclosed, Plaintiffs would have exercised their appraisal rights and had their stock valued in an appraisal proceeding.  Furthermore, Plaintiffs would have been made aware that the amount being paid in the Squeeze-Out Mergers was inadequate, and would have taken additional steps to prevent consummation of the Restructuring Plan such as instituting an action for injunctive relief.

67.    In addition to the preceding, the Information Statement used for the FSNB Merger contained additional omissions of state material facts necessary in order to make the statements made in the Information Statements not misleading, including but not limited to the following:

a.    Nowhere in the Information Statement was there disclosed that BAG, in concluding that the value of the FSNB common stock was $3,775 per share, applied an excessive 15.27% discount rate to the present value of the projected earnings of FSNB although BAG's calculation of the corresponding discount rate for the publicly-traded comparable companies to FSNB used as part of its analysis amounted to 9.77%.   Nowhere was there disclosed in the Information Statement (i) that BAG had initially assigned FSNB a "specific company adjustment rate" (the amount which would be added to the publicly-traded company comparable rate) of 2% but later increased that rate from 2% to 5.5%, (ii) the reasons why BAG arbitrarily increased FSNB's "specific company adjustment rate" from 2% to 5.5%, (iii) the effect of this increase on the final value per share for the FSNB common stock or (iv) why BAG arbitrarily increased the discount rate applicable to FSNB by 5.50% over the publicly-traded company comparable rate, all of which greatly lowered the BAG valuation of FSNB.

b.    Nowhere in the Information Statement was there disclosed that BAG, in concluding that the value of the FSNB common stock was $3,775 per share, arbitrarily applied a 10.66x multiple to the projected earnings of FSNB although the median average corresponding multiple for the publicly-traded

comparable companies to FSNB selected by BAG as part of its analysis was 17.74x. Nowhere was there disclosed in the Information Statement the reasons why BAG arbitrarily applied a price earnings multiple which was 60% of the median price earnings multiple of the publicly-traded comparable companies that it had selected as comparables, and thereby again greatly lowering the BAG valuation of FSNB.

      c.     Nowhere in the Information Statement was there disclosed that BAG reduced the value that it assigned to FSNB as a result of "inferior level of operating efficiency" or the fact that FSNB's poor operating efficiency was, in large part, the result of (1) high salaries and benefits paid to or on account of members of the Control Group, (2) exorbitant fees for data processing, telecommunications and internet banking expenses paid to DPI and Telephone Services, and (3) the diversion of Interchange Fee Income from FSNB to DPI.

68.    Had the items in Paragraph 67(a) through (c) been properly disclosed, Plaintiffs would have exercised their appraisal rights and had their stock valued. Furthermore, Plaintiffs would have been made aware that the amount being paid in the Squeeze-Out Mergers was inadequate, and would have taken additional steps to prevent consummation of the Restructuring Plan such as instituting an action for injunctive relief.

69.    In addition to the preceding, the Information Statement used for the CNB Merger contained additional omissions of material facts necessary in order to make the statements made in the Information Statements not misleading, including but not limited to the following:

a.     Nowhere in the Information Statement was it disclosed that BAG, in concluding that the value of the CNB common stock was $660 per share, applied an excessive 13.77% discount rate to the present value of the projected earnings of CNB although BAG's calculation of the corresponding discount rate for the publicly-traded comparable companies to CNB used as part of its analysis amounted to 9.77%.  Nowhere was there disclosed in the Information Statement (i) that BAG had initially assigned CNB a "specific company adjustment rate" (the amount which would be added to the publicly-traded company comparable rate) of 1% but later increased that rate from 1% to 4%, (ii) the reasons why BAG arbitrarily increased CNB's "specific company adjustment rate" from 1% to 4%, (iii) the effect on this increase on the final value per share for the CNB common stock or (iv) why BAG arbitrarily increased the discount rate applicable to CNB by 4.0% over the publicly-traded company comparable rate, all of which greatly lowered the BAG valuation of CNB.

b.     Nowhere in the Information Statement was there disclosed that BAG, in concluding that the value of the CNB common stock was $660 per share, arbitrarily applied a 14.54x multiple to the projected earnings of CNB although the median average corresponding multiple for the publicly-traded comparable companies to CNB selected by BAG as part of its analysis was 17.74x.  Nowhere was there disclosed in the Information Statement the reasons why BAG arbitrarily used a price earnings multiple which was 82% of the median price earnings

multiple of the publicly-traded comparable companies that it had selected as comparables, and thereby again greatly lowering the BAG valuation of CNB.

c.      Nowhere in the Information Statement was there disclosed that BAG reduced the value which it assigned to CNB as a result of "inferior level of operating efficiency" or the fact that CNB's poor operating efficiency was, in large part, the result of (1) high salaries and benefits paid to or on account of members of the Control Group, (2) exorbitant fees for data processing, telecommunications and internet banking expenses paid to DPI and Telephone Services, and (3) the diversion of Interchange Fee Income from CNB to DPI.

70.      Had the items in Paragraph 69(a) through (c) been properly disclosed, Plaintiffs would have exercised their appraisal rights and had their stock valued in an appraisal proceeding.   Furthermore, Plaintiffs would have been made aware that the amount being paid in the Squeeze-Out Mergers was inadequate, and would have taken additional steps to prevent consummation of the Restructuring Plan such as instituting an action for injunctive relief.

71.      In addition to the preceding, the Information Statement used for the JRM Bancorp Merger contained omissions of material facts necessary in order to make the statements made in the Information Statements not misleading, including but not limited to the following:

a.      Nowhere in the Information Statement was there disclosed that BAG, in concluding that the fair value of the JRM Bancorp common stock was $27,750 per share (i) discounted the value of its ownership interest in its 40.12%

owned subsidiary, FSNB, at a 13.77% discount rate; or (ii) that the value determined by BAG for the JRM Bancorp common stock was based upon a "Non-Synergistic Control Value" valuation technique, also referred to in applicable case law as the "implicit minority discount," the application of which resulted in a reduction in the value of JRM Bancorp common stock in an amount somewhere between $7,909 per share and $8,568 per share, as estimated by BAG. Oklahoma law does not permit any discounts, whether express or implicit, to be a factor in determining whether a shareholder has received "fair value" in a squeeze-out merger.

       b.      Nowhere in the Information Statement was there disclosed that BAG reduced the value which it assigned to JRM Bancorp as a result of "inferior level of operating efficiency" or the fact that JRM Bancorp's poor operating efficiency was, in large part, the result of (1) high salaries and benefits paid to or on account of members of the Control Group, and (2) exorbitant fees for data processing, telecommunication and internet banking expenses paid by JRM Bancorp's subsidiaries, CNB and FSNB, to DPI and Telephone Services, and (3) the diversion of Interchange Fee Income from JRM Bancorp's subsidiaries, CNB and FSNB, to DPI.

72.    Had the items in Paragraph 71(a) through (b) been properly disclosed, Plaintiffs would have exercised their appraisal rights and had their stock valued. Consequently, Plaintiffs would have known that the amount being paid in the Squeeze-

Out Mergers was inadequate, and would have taken additional steps to prevent consummation of the Restructuring Plan such as instituting an action for injunctive relief.

73.     In addition to the preceding, all three of the Information Statements identified above omitted material facts necessary to make the statements contained therein not misleading, including the nondisclosure that for many years prior to the Squeeze-Out Mergers, the Control Group had been improperly diverting substantial assets of the Target Companies to DPI and Telephone Services.  Specifically, the Control Group caused the Target Companies to incur extraordinary charges for data processing and internet banking services, and diverted Interchange Fee Income from FSNB and CNB to DPI.  As a result, DPI was able for many years to (1) pay extraordinary salaries and other employees benefits in large part to the Control Group, (2) pay extraordinary directors' fees which were paid entirely to the Control Group, (3) realize an extraordinary level of income based upon DPI's equity capital, and (4) pay extraordinarily large dividends to DPI shareholders (primarily members of the Control Group).  In 2009 alone, these amounts comprised millions of dollars. Similarly, in 2009 FSNB and CNB incurred extraordinary amounts in excess of $2 million for telecommunication expenses, paid to DPI and/or Telephone Services, which was owned and/or controlled by the Control Group.

74.     Had the facts relating to the diversion of substantial assets from the Target Companies to DPI and Telephone Services been disclosed, Plaintiffs would have exercised their appraisal rights and had their stock valued considering the amounts wrongfully diverted.  Consequently, Plaintiffs would have known that the amount being

paid in the Squeeze-Out Mergers was inadequate, and would have taken additional steps to prevent consummation of the Restructuring Plan. Plaintiffs also would have instituted a shareholder derivative suit against the Control Group for the flagrant breaches of duty which, due to their forced sale of stock in the Target Companies, they are no longer able to do.

## CAUSES OF ACTION

### CLAIM I – VIOLATION OF THE EXCHANGE ACT

75.     Plaintiffs incorporates the allegations contained in Paragraphs 1 through 74 as if fully set forth herein.

76.     The untrue statements of material fact and omissions of material fact listed above in Paragraphs 63 through 74 are statements/omissions that a reasonable investor would consider important in making an investment decision and would regard as significantly altering the total mix of information made available.

77.     Defendants' purpose in making the untrue statements of material fact and omissions of material fact as described above was to hide the fact that it had taken steps to artificially depress the amounts Plaintiffs received for their stock in the Squeeze-Out Mergers. As forced sellers under the Squeeze-Out Mergers, Plaintiffs would have exercised appraisal rights but for the untrue statements and omissions.

78.     The representations set forth above in Paragraphs 63 through 74 were false when made. The material facts omitted as described above in Paragraphs 63 through 74 were necessary in order to make the statements made not misleading.

79.     Defendants knew that the representations and omissions set forth in Paragraphs 63 through 74 were false when made.  In addition, Defendants knew that the material facts omitted as described above in Paragraphs 63 through 74 were necessary in order to make the statements made not misleading.  Specifically, Defendants knew that not omitting the information described above would have showed that the price received by Plaintiffs for their shares of the Target Companies in the Squeeze-Out Merger was inadequate and improperly determined.

80.     Defendants intended that Plaintiffs should rely upon the representations and omissions set forth in Paragraphs 63 through 74.  Specifically, Defendants intended that Plaintiffs receive the inadequate price in the Squeeze-Out Mergers and not take any additional steps to discover that the proper price was much higher. Additionally, Defendants intended to hide the opportunity for Plaintiffs to institute a shareholders derivative action against Defendants based on their self-dealing and other breaches of duties to the Plaintiffs.

81.     Defendants utilized the instrumentalities of interstate commerce in connection with the transaction described herein, including the U.S. mail, fax and telephones.

82.     Plaintiffs relied upon the representations and omissions set forth in Paragraphs 63 through 74 by not contesting the actions of the Control Group at the time made and not exercising their appraisal rights, and not bringing a shareholders derivative suit.

83.     The representations and omissions set forth in Paragraphs 63 through 74 constitute material misstatements and omissions in connection with the sale of a security in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as Plaintiffs constitute forced sellers of their shares of the Target Companies. Defendants caused the misrepresentations and omissions contained in the Information Statements and general nondisclosure of material facts to be made in connection with their scheme to orchestrate the Squeeze-Out Mergers and obtain greater control over the Target Companies.

## CLAIM II – BREACH OF FIDUCIARY DUTY/ENTIRE FAIRNESS

84.     JRMB II and the Target Companies have breached their fiduciary duties to the Plaintiffs and all other minority shareholders by, among other things, misusing corporate assets and opportunities that have permitted the Control Group to gain increased ownership and control of the Target Companies and perpetuate that control in themselves and their heirs.

85.     JRMB II and the Target Companies have breached their fiduciary duties to the Plaintiffs and all other minority shareholders by, among other things, structuring, approving, and implementing the Restructuring Plan, including the Exchange Offer and each of the Squeeze-Out Mergers, utilizing an unfair process and an unfair price.

86.     Because the Control Group was in a position of control of JRMB II and each of the parties to the Squeeze-Out Mergers, and because the Control Group had a personal interest and benefit in obtaining the lowest price possible for the shares in the Target Companies, applicable law imposes on each of the Defendants a duty of entire

fairness with respect to all aspects of the Restructuring Plan.  Defendants breached that duty.  Because of this conflict position, applicable law mandates that the Defendants have the burden of proof to affirmatively demonstrate that the Restructuring Plan meets the standard of entire fairness which consists of both fair process and fair price.

87.     The Defendants' implementation of the Restructuring Plan was part of a conspiracy and scheme, orchestrated by the Control Group in bad faith, to eliminate persons as shareholders who were not members of the Control Group, their immediate families, or certain persons with other close ties to the Control Group.  The scheme was improper as the Defendants used corporate funds, assets and opportunities in order to permit the members of the Control Group to profit individually, each in breach of their fiduciary duties.

88.     The controlling shareholders in a merger transaction are subject to the entire fairness test.  The Defendants, other than FSNB and CNB, were both the controlling shareholders and the controlling directors in each of the Squeeze-Out Mergers.  Each of those Defendants has breached its fiduciary duties by enacting the Squeeze-Out Mergers using an unfair process and at an unfair price.

89.     The tender of a controlling interest in the Target Companies to JRMB II in the Exchange Offer constituted a sale of a controlling interest in each of the Target Companies to JRMB II.  Upon a sale of control, applicable law requires each of the Target Companies to seek the highest price for all shareholders and not simply the price dictated by the Control Group.  The Defendants' failure to seek the highest price reasonably available for the shares of common stock of the Target Companies is a

violation of their fiduciary duty to seek the highest price reasonably available for the Target Companies.

90.    The Defendants' breach of fiduciary duties and other tortious actions have caused the Plaintiffs to receive less than fair value for their common stock of JRM Bancorp, FSNB and CNB.

91.    Each of the transactions comprising the Restructuring Plan constituted self-dealing transactions orchestrated by the Control Group.  These transactions resulted in breaches of the Defendants' duties owed to the Plaintiffs and all other minority shareholders.

92.    The numerous misstatements and omissions included in the Information Statements related to the FSNB Merger and the CNB Merger constituted a breach of the duty owed by FSNB and CNB to each of its shareholders pursuant to Section 5.33(a)(8) of Title 12 of the Code of Federal Regulations applicable to national banks which mandates that, in business combination transactions such as the Squeeze-Out Mergers, the national bank shall inform shareholders of all material aspects of the business combination, shall comply with all applicable requirements of the federal securities laws, and shall ensure that all proxy and information statements prepared in connection therewith do not contain any untrue or misleading statements of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants FSNB and CNB breached that duty.

93.     The Restructuring Plan, including the Exchange Offer and the Squeeze-Out Mergers, is the result of an unfair process in, at least, the following manners:

a.      The absence of any provision in the Merger Agreements used for the Squeeze-Out Mergers requiring the approval of a majority of the minority shareholders of the Target Companies, in light of the voting control of the Control Group;

b.      The absence of any independent input from the minority shareholders into the process, the price, or the timing of the Squeeze-Out Mergers;

c.      The absence of any independent input from the minority shareholders as to which shareholders of the Target Companies would be offered to participate in the Exchange Offer;

d.      The absence of any structure or negotiation designed to ensure entire fairness to and fair dealing with the Plaintiffs and other minority shareholders;

e.      The failure to establish independent committees of the Boards of Directors of each of the Target Companies whose duty was to protect the interest of the stockholders to be squeezed out;

f.      The misuse of BAG, who is not independent, as a purportedly independent advisor to establish and authenticate the unfair price for which the minority shareholders were cashed out in the Squeeze-Out Mergers;

g.      The total absence of any disclosure in the Information Statements with respect to the methodology and conclusions of BAG's work;

h. The structuring of the Squeeze-Out Mergers without a single procedural or substantive element designed to assure entire fairness; and

i. The failure to seek a third-party purchaser for JRM Bancorp, FSNB or CNB.

94. The Defendants' disclosures regarding BAG were designed and intended to suggest that BAG's work could be used in establishing the fairness of the transaction from the perspective of the squeezed out shareholders. However, because BAG was not independent and was, in fact, working for and reporting to the Control Group and the Defendants, BAG could perform no such role. Thus, the disclosures regarding BAG and the discussion of its work, as limited as it was, in the BAG letters included as appendices to the Information Statements, misrepresented the usefulness of the work done by BAG and misrepresented that it could serve as an appropriate benchmark for determining the fairness of the transaction. Such misrepresentations constituted a breach of Defendants' fiduciary duties owed to the Plaintiffs and the other minority shareholders.

95. The merger consideration being paid to the cashed out shareholders in the Squeeze-Out Mergers is grossly inadequate in, at least, the following respects:

a. The cash consideration does not reflect the fair value of the shareholders' investment in the Target Companies, including known and foreseeable future prospects;

b. The appraisals obtained from BAG used an excessive discount rate to drive down the value assigned to the common stock of JRM Bancorp, FSNB and CNB and provided no explanation or justification as to the reasons why the

discount rate selected by BAG far exceeded the corresponding discount rate for the publicly traded comparable companies which BAG had identified;

c.   The appraisals obtained from BAG applied an excessively low multiple to the projected earnings of FSNB, CNB and JRM Bancorp for the purpose of driving down the value assigned to the common stock of FSNB, CNB and JRM Bancorp, and provided no explanation or justification as to the reasons why the earnings multiple selected by BAG was significantly less than the corresponding earnings multiple for the publicly traded comparable companies which BAG had identified;

d.   Without any explanation or justification, BAG discounted the value of the excess capital maintained by FSNB and CNB during an assumed and arbitrary payout period (five years in the case of FSNB and CNB and indefinitely in the case of JRM Bancorp) when in fact, that excess capital was to be used immediately to fund the Squeeze-Out Mergers;

e.   In determining the fair value of JRM Bancorp, BAG failed to apply a control premium to JRM Bancorp as required by applicable law; and

f.   BAG improperly employed a valuation technique known as "Non-Synergistic Control Value" in its valuation of JRM Bancorp to reduce its valuation of JRM Bancorp by somewhere between $7,909 per share and $8,568 per share, as estimated by BAG.

g.   The Defendants failed to seek the highest reasonably obtainable value for JRM Bancorp, FSNB or CNB.

96.     Defendants conduct and breaches of fiduciary duty were intentional, willful, wanton and malicious such as entitles Plaintiffs to an award of punitive damages.

## COUNT III – BREACH OF THE
## OKLAHOMA UNIFORM SECURITIES ACT OF 2004

97.     In connection with the Squeeze-Out Mergers, the Defendants mailed to the minority shareholders the Information Statements that contained untrue or misleading statements of material fact and omitted to state material facts necessary in order to make the statements made in the Information Statements, in light of the circumstances under which they were made, not misleading, all as described above.   The Squeeze-Out Mergers constituted a forced sale of the minority shareholders' stock in JRM Bancorp, FSNB and CNB.   Such actions constituted a breach of Section 1-509(C) of the Oklahoma Uniform Securities Act of 2004.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants and respectfully demand that Plaintiffs be awarded the following relief:

(1)     That the Court declare that Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged herein;

(2)     That the Court declare that the Defendants have acted in breach of their fiduciary duties, as alleged herein;

(3)     That the Court order the Defendants to award recessionary damages to each Plaintiff;

(4)     That Plaintiffs be awarded damages against the Control Group due to the actions alleged herein which have been taken in bad faith and resulted in an improper personal benefit to the Control Group;

(5)     That the Court declare that the Defendants have breached the Oklahoma Uniform Securities Act of 2004, as alleged herein;

(6)     That the Court declare the rights and legal relations of the parties arising from or related to this dispute, and fully and finally resolve the dispute and all related claims between the parties;

(7)     That Plaintiffs be awarded all legal relief to which Plaintiffs are entitled, to include compensatory, consequential, and punitive damages;

(8)     That Plaintiffs be awarded such damages as they have suffered;

(9)     That Plaintiffs be awarded pre- and post-judgment interest;

(10)    That Plaintiffs be awarded the cost of this action, including expert and attorneys' fees as permitted by statute and the law; and

(11)    That Plaintiffs be awarded all such other and further relief at law or equity as is just and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand that this case be tried before a jury.

Dated this 13th day of September, 2012.

<div style="margin-left: 40%;">

s/ *John N. Hermes*
John N. Hermes, OBA #4976
Spencer F. Smith, OBA #20430
Jeremiah L. Buettner, OBA #21615
MCAFEE & TAFT A PROFESSIONAL CORPORATION
Tenth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
(telephone) 405-235-9621
(facsimile) 405-235-0439
john.hermes@mcafeetaft.com
spencer.smith@mcafeetaft.com
jeremiah.buettner@mcafeetaft.com

and

George D. Sherrill, Jr., OBA # 8174
15 N. 9th Street
PO Box 1427
Duncan, OK 73134
Telephone: (580) 255-4840
Facsimile: (580) 255-4842
gsherrill@cableone.net

</div>

**ATTORNEY'S LIEN CLAIMED**